UNITED STATES *v.* T. E. ASH (AMERICAN ASKANIA CORP.); FREEDMAN & SLATER (NO. 3785)[1]

United States Court of Customs and Patent Appeals, November 13, 1934

*Joseph R. Jackson,* Assistant Attorney General (*Ralph Folks* and *John F. Kavanagh,* special attorneys, of counsel), for the United States.
*Ira P. Jones, Jr.,* for appellees.

[Oral argument October 9, 1934, by Mr. Folks and Mr. Jones]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

This is a reappraisement proceeding in which the Government has appealed from a judgment of the First Division of the United States Customs Court holding cost of production as respectively defined in sections 402 (e), Tariff Act of 1922, and 402 (f), Tariff Act of 1930,

---

[1] T. D. 47401.

to be the proper dutiable value of the merchandise and that such value had been shown by the record in the case.

The merchandise consists of what are called "torsion balances" and "magnetic field balances," and accessories for each, which are used on the surface of the ground for locating the position and probable depth of mineral deposits (especially oil) below the surface.

Forty-three entries are involved, of which 42 were made under the Tariff Act of 1922 and one (for a relatively minor part) under the Tariff Act of 1930. Forty-one of the entries were made at the port of Houston, Tex., and two at the port of New York. For the purposes of trial and determination, all appeals were consolidated in a single case.

At the first trial of the case before Brown, J., sitting in reappraisement, it was held by him that the proper dutiable value was United States value, he finding that neither foreign nor export value existed. The effect of his judgment sustained the entered value.

Upon appeal, the Third Division of the United States Customs Court reversed the judgment of Brown, J., holding the United States value had not been shown, and remanded the case with instructions to dismiss the appeal.

Importers thereupon filed a motion for rehearing which was granted, and, upon rehearing, the Third Division again reversed the judgment of Brown, J., but remanded it with instructions "to proceed anew with the trial of said cases."

The order of the division also directed the trial court "to limit the scope of the evidence" in certain respects. In the view which we take of the case, it is unnecessary to quote this limitation in full. The First Division held, we think correctly, that the direction "was not necessary," because the act itself "provides the method to establish value, and before resorting to the cost of production, it must be shown that there was not a foreign, export, or United States value."

The retrial, upon remand, was before Kincheloe, J., who found that the importer had "proved conclusively" the absence of "either foreign, export, or United States values" of the merchandise, but who also held that there had been a failure to show cost of production within the purview of the statute, and entered judgment dismissing the case. The effect of this action was to sustain the appraisements of the local appraiser.

Both the importer and the Government appealed from the judgment rendered by Kincheloe, J. The importer assigned error as to the holding respecting failure to show cost of production, and the Government assigned error as to the finding that there was no foreign value and as to certain questions respecting alleged duress entries. Also error was assigned relative to the admission of certain evidence presented on behalf of the importer.

The appeal was heard by the First Division of the United States Customs Court. The division sustained the finding of the single judge as to absence of foreign, export, or United States values, but, being of the opinion that cost of production had been established within the purview of the statute, reversed upon that issue, and rendered judgment, the practical effect of which was to sustain the values as entered by the importer.

The findings of fact by the respective trial tribunals may be summarized as follows:

The instruments involved are highly scientific and delicate in their nature. They are used principally in the State of Texas for locating oil deposits. There is no demand for them for this purpose in Germany, the country of origin, and the few sold there, during the period when the involved importations were being made, were sold to educational or scientific institutions, being sold directly by the manufacturers to such institutions, the sales being limited to a single instrument to each purchaser.

The instruments are manufactured exclusively by a company, generally referred to in the record as Askania Werke. The importations at issue were made through T. E. Ash (customs broker) as agent of American Askania Corp., a corporation organized under the laws of the State of Texas, whose entire capital stock was, at the time of the importations, owned by the German manufacturers—in other words, by Askania Werke.

By the terms of a contract executed in March 1929, by and between Askania Werke and American Askania Corp., the latter bound itself to purchase all instruments and apparatus on its own account, at prices which (we quote from the contract) "can by no means be higher than the factory prices of the Askania Werke, which, in addition to the cost, will include a profit of fifteen (15) percent."

The foregoing findings of fact, as summarized in our own phraseology, are amply sustained by the record. Indeed, there is no serious dispute concerning them on the part of the Government.

There was, however, an omission on the part of the First Division to make any finding with respect to *offers of sale* in Germany and we observe no discussion of this in either the opinion of Brown, J., or that of Kincheloe, J. The relevancy and importance of this will be hereinafter considered.

Broadly, the Government makes two contentions:

First, that the price at which the sales of single instruments were made, or at which offers of sale were made, in Germany, constitutes a statutory foreign value which is the dutiable value.

Second, that if there be no foreign value and cost of production be the correct basis for appraisement, the importer failed to prove the statutory cost of production, in that (a) there was no proof of the

actual cost of production of certain parts purchased by the German manufacturer from others and embodied in the structures, and (b) that the profit (15%) included does not represent the full amount of profit which the statute contemplates should be added.

The Government also alleges error to have been committed by the division "in not finding and holding that the trial court had erred in admitting in evidence collective Exhibit 3." This assignment will be first considered.

Exhibit 3 consists of an affidavit made jointly by seven persons, residents of Germany, each of whom seems to have been an official of, or connected with, the German manufacturer. It is a comprehensive document in a rather unusual form, and somewhat complicated, but, as the trial tribunals indicate, it bears internal evidences of having been prepared with much care.

We have examined the objections urged against its admission by Government counsel during the course of the trial before Kincheloe, J. Counsel's comments there made concerning it were somewhat diffuse, but there is really no clear statement of the exact basis of objection. His statements rather comprise arguments to the effect that no weight should be given it, or what its proper interpretation should be, if admitted.

We find no error in the admission of the affidavit. The statutes provide for this character of evidence in reappraisement proceedings. Section 501, Tariff Act of 1922; *idem*, Tariff Act of 1930. The weight to be given such evidence is, of course, a matter for the tribunals of the United States Customs Court, and not this court, to determine. *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478; *Amtorg Trading Corp.* v. *United States*, 21 C. C. P. A. (Customs) 532, T. D. 46975.

As we view the case, the question of whether there was a foreign value for this merchandise is of first importance. Both the trial and appellate tribunals of the United States Customs Court agreed in the conclusion that the importer had established that none existed.

It is our interpretation of the opinions of those tribunals that the conclusion must have been arrived at upon the basis of what was shown with regard to the course of business followed in making *actual sales* in Germany, and that no consideration was given to *offers of sale*. There is no finding as to whether *as a fact* such merchandise as this was "freely offered for sale."

The language which defines foreign value is identical in both the tariff acts, under which the importations were respectively made, and reads:

* * * The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is *freely offered for sale* to all pur-

chasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade  *  *  *.   (Italics ours.)

It will be observed that the section says nothing of *actual sales*. The phrase is "freely offered for sale."  In the *Oceanic Trading Co.* case, *supra*, this court said:

*  *  *  it is sufficient to say that neither foreign nor export value, as defined by subdivisions (c) and (d), respectively, of section 402 of the Tariff Act of 1930 [which is the same as that used in the 1922 act], is limited to the market value or price at which such or similar merchandise is *sold*, but includes the price at which it is *freely offered for sale*.   Accordingly, where it has been established that such or similar merchandise was freely offered for sale, as required by the statute, the absence of evidence of actual sales is not of vital consequence.   *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. (Customs) 394, T. D. 44641, and cases cited therein.

Section 500 (a) (1) of the Tariff Act of 1922 provides:

(a) It shall be the duty of the appraiser  *  *  *
(1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding;

*          *          *          *          *          *          *

This language is repeated *in haec verba* in section 500 of the Tariff Act of 1930.

Section 501 of the Tariff Act of 1922 and section 501 of the Tariff Act of 1930 both provide, in cases of reappraisement, where appeal is taken to the United States Customs Court:

*  *  *  In finding  *  *  *  value affidavits of persons whose attendance can not reasonably be had, price lists, catalogues, reports  *  *  *  of  *  *  *  special agents  *  *  *  may be considered.

In the case of *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. (Customs) 394, 398, T. D. 44641, this court, citing a number of authorities, pointed out the competency of price lists as evidence, and, *inter alia*, said:

*  *  *  if the Customs Court, after weighing the evidentiary value of a price list, comes to the conclusion that it is not entitled to any probative force, this court will not disturb such finding, but it does not mean that the lower court may, *because of an erroneous conception of the law*, decline to weigh a price list duly offered in evidence.   [Italics not in original.]

In the case at bar there was a report by a special agent.   The opinion of the appellate division alludes to it in the following language, after stating a conclusion deduced from the testimony of a witness for importer:

*  *  *  In addition, the special agent's report establishes there was not a foreign or export value; that sales of such merchandise, outside of that involved

in the case at bar, were limited to sales of a single instrument, usually to educational or scientific institutions. There was not any wholesale market, the purchases being by users or consumers.

In view of what we deem to be the importance of the issue raised here in regard to the existence of foreign value, we quote the following *in extenso* from the special agent's report:

II. *Foreign value.*—Of about 200 magnetic field balances produced in a year the great majority go to the United States, about a fourth as many to the rest of the world, while only five or six are sold in Germany and these singly to scientific or educational institutions as a rule.

In Germany only a few oil wells exist and the districts have long ago been thoroughly explored geologically, etc., so that there is no demand or market in Germany for the field balances (and torsion balances) for the use of oil producers or exploration.

Instruments of this kind are so seldom called for or sold in Germany and then singly to individual purchasers—and as to each one sold experts of the company must devote a good deal of time in explaining how to use and care for the instruments, as they are extremely scientific and delicate—it is impracticable for the company to place them through the ordinary market channels through wholesale dealers in optical or other ordinary well-understood scientific instruments.

They are not handled in a wholesale way through wholesale dealers with a customary discount of possibly 40 to 50 % to such dealers. The small demand and the nature of the articles require that they should be sold for home consumption in Germany directly to the ultimate users.

*Price lists, etc.*—There are enclosed herewith three copies each of the German price list for torsion balances and accessories, dated May 1, 1929. To each is pinned inside an illustrated descriptive catalogue in English which corresponds to one the company issued in Germany.

Price list and descriptive catalogue are labelled Exhibits K and K–1, respectively.

Similarly (two copies in German and one in English) three copies of price list covering magnetic field balances are sent attached to illustrated descriptive catalogues (English). These marked Exhibits J and J–1, respectively.

The English copy of price list is dated February 1st, 1929. The German copies (identical except as to language) are dated May 1, 1929. I was given another copy of this in German retained in the file here—dated December 1, 1928, in which the prices are also the same.

The prices for the torsion balances and the magnetic field balances have been in effect for over two years past and are still in effect.

The prices for the accessories are now in effect and have been evidently for the past six months at least, but these are subject to change as to occasional items due to fluctuations of certain costs.

*Re prices, terms, etc. (inland).*—It will be noted that these German list prices of the instruments with usual accessories are as follows:

| | |
|---|---|
| Large torsion balance (Eötvos-Schweydar with regular accessories | Mk 1, 500. 00 |
| Small torsion balance—ditto | " 1, 500. 00 |
| Magnetic vertical field balance including stand and sail cloth pocket for instrument boxes and stand (Ad. Schmidt) | " 2, 400. 00 |
| Magnetic horizontal field balance including same as for vertical | " 2, 400. 00 |

Prices are *net per list*, unless as might happen by agreement some special reduction should be granted for some reason.

*Terms of delivery.*—At the factory.

*Packing, and all other charges*, extra.

*Copies of inland sales.*—I obtained copies of all inland sales for the year 1928, to the present time.

These are sent herewith in duplicate, marked Exhibits L, M, N, O, P, Q.

It will be noted these cover individual single pieces, sold mostly to scientific or educational institutions.

The several exhibits, including the catalogues and price lists, referred to in the above-quoted part of the special agent's report, were made parts of the record along with the report.

The point of particular importance in the foregoing is not, as we view it, comprised in such statements as those saying, "it is impracticable for the company to place them through the ordinary market channels through wholesale dealers * * *." "They are not handled in a wholesale way through wholesale dealers * * *," and like expressions. All these statements may be strictly true. We do not question them, but these do not settle the *question of law* relating to the existence of foreign value. Neither does the fact that the *actual sales* made "for home consumption in Germany" were "directly to the ultimate users."

The important factor is that certain evidence, admissible under the provisions of the respective statutes, was presented showing the issuance by the manufacturer in Germany of catalogues and price lists, offering such merchandise for sale in Germany, during the period when the exportations here involved were made, and no evidence has been presented to negative the *fact* of such offers, nor has any effort been made to show that these were not free offers open to any and all purchasers in whatever quantity or quantities—whether 1 device or 100 devices, or more—that such purchaser or purchasers might have desired.

We are thus confronted with a situation wherein both the trial court and the appellate division made negative findings as to the existence of foreign value without even having referred in their decisions to the evidence relating to *offers of sale* in Germany. We have no means of determining whether those tribunals considered the evidence upon that point and rejected it as not being true, or for some other reason or reasons, or whether they held simply as a *matter of law*, that, even if accepted as proving a fact, the said fact of offers of sale made in the manner so shown, did not establish foreign value within the purview of the respective statutes.

In the absence of any expression, in their opinions, indicating rejection of the evidence, the latter hypothesis would seem to be the most

reasonable and natural one, and we are unable to concur in this legal view. We regard it erroneous as a matter of law.

If the statute required foreign value to be determined on the basis of actual foreign sales, the question might be a more difficult one, in view of the clause "in the usual wholesale quantities and in the ordinary course of trade," but the statute does not so require and no necessity exists for any adjudication here of the effect of the actual foreign sales upon the question of foreign value.

If, as a matter of fact, these devices were being freely offered to all purchasers at the "list prices net" in whatever quantities a purchaser might wish, at the time of the exportation here involved, we are of the opinion that, considering the nature of the merchandise and the "ordinary course of trade" practiced in Germany with reference thereto, such prices constituted a proper basis upon which to predicate foreign value.

Under the hereinabove-expressed view as to the foreign-value phase of the controversy, it is not necessary that we give consideration to the cost of production phase.

An examination of this court's opinion in the *Oceanic Trading Co.* case, *supra*, will disclose a striking analogy between certain legal aspects of that case and certain legal aspects of the instant case. There, as here, was a negative finding by the appellate division respecting foreign value, without any indication in its opinion that certain evidence had been "considered and weighed by the court for the purpose of determining whether it was sufficient, in view of all the facts and circumstances of record, to establish *foreign values*"—a procedure which we held should have been followed. See also the *Baldwin Universal Co.* case, *supra*.

The concluding paragraph of our opinion in the *Oceanic Trading Co.* case, *supra*, reads:

In view of the fact that the jurisdiction of this court in reappraisement cases is limited to questions of law only, the judgment must be *reversed*, and the cause *remanded* to the Appellate Division of the Customs Court to give it an opportunity to weigh the evidence in the light of the views herein expressed.

A similar order is deemed proper here, and judgment will be entered accordingly.